**SECURITY BANK MINNESOTA,**
Appellee,

v.

**COMMISSIONER OF INTERNAL
REVENUE SERVICE,**
Appellant.

No. 92–2247.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 17, 1992.

Decided May 21, 1993.

Charles Bricken, Dept. of Justice, Washington, DC, argued (Gary R. Allen, James A. Bruton and Jonathan S. Cohen, on the brief), for appellant.

Gary Hansen, Minneapolis, MN, argued (Sue Ann Nelson and Terrance A. Costello, on the brief), for appellee.

Before MAGILL, Circuit Judge, HEANEY, Senior Circuit Judge, and BEAM, Circuit Judge.

MAGILL, Circuit Judge.

This case presents an issue of first impression: whether § 1281 of the Internal Revenue Code, which requires certain taxpayers to accrue discount and interest income on certain short-term obligations, requires a commercial bank, otherwise reporting its income on the cash basis, to report interest income on short-term loans made to borrowers in the ordinary course of business as it accrues. The tax court held that § 1281 did not apply to such loans. We agree, and affirm.

## I. BACKGROUND

### A. Factual Background

This case involves an asserted deficiency in Security Bank's federal income tax for the taxable year 1986. The case arises on facts stipulated before the tax court.

Security Bank Minnesota (Security) is a small commercial bank in Albert Lea, Minnesota, a rural, agricultural community. It is a Minnesota corporation with its principal place of business in Minnesota. Much of Security's business consists of agricultural operating loans to farmers.

At all material times, Security was a bank as defined in I.R.C. § 581. During 1986, Security made loans of varying duration, including loans of less than one year, one year, and more than one year. These loan transactions were documented by one-page promissory notes signed by the borrower and payable to Security. Security had various business reasons for using a note with a term of one year or less;[1] it is uncontroverted that the loans were not made for tax-motivated considerations.

During 1986, Security made certain loans that were documented by notes with a stated maturity date of the first anniversary of the note. The parties refer to these loans as "Category X Loans." During 1986, Security had interest income of $24,552.09 that had accrued, but was not yet received, on its Category X Loans.

During 1986, Security also made loans that were for a period of less than one year, which the parties refer to as "Category Y Loans." Security had interest income respecting these Category Y Loans of $80,746.42 that accrued, but was not received, in 1986.

For 1986, Security reported interest income from its Category X and Category Y Loans as it was received, pursuant to the cash method of accounting.[2] Security did not report as income in 1986 the accrued, but not yet received, interest on its Category X and Category Y Loans.

Subsequently, the Internal Revenue Service audited Security's 1986 income tax re-

---

1. These business reasons included the preference of state and federal regulatory authorities for agricultural operating loans with terms of one year or less, the fact that such loans allowed Security the opportunity to meet with borrowers and review the borrower's financial status at less than one year intervals, and the fact that such terms allowed Security greater control over uncollectible debts. Jt.App. at 8–9.

2. Security was allowed to use the cash method of accounting in 1986 because it had gross income of less than $5 million. See I.R.C. § 446(a), (c)(1); I.R.C. § 448(b)(3).

turn and determined that I.R.C. § 1281(a)(2) required Security to depart from its normal cash basis of reporting income and to report as taxable income for 1986 the $105,299 of accrued interest from its Category X and Category Y Loans. The Commissioner's proposed increase to Security's income for 1986 resulted in an alleged deficiency of $48,437.80 in Security's 1986 income tax. Security then filed a timely petition with the tax court, which held that I.R.C. § 1281 did not require the accrual of stated interest on undiscounted bank loans made in the ordinary course of business. This appeal followed.

I.R.C. § 1281 provides:

(a) General rule.—In the case of any short-term obligation to which this section applies, for purposes of this title—

(1) there shall be included in the gross income of the holder an amount equal to the sum of the daily portions of the acquisition discount [3] for each day during the taxable year on which such holder held such obligation, and

(2) any interest payable on the obligation (other than interest taken into account in determining the amount of the acquisition discount) shall be included in gross income as it accrues.

Section 1281 applies to short-term obligations held by certain classes of taxpayers, including "any short-term obligation which ... is held by a bank (as defined in section 581) . . . ." I.R.C. § 1281(b)(1)(C). Finally, a short-term obligation, for purposes of § 1281, is defined as "any bond, debenture, note, certificate, or other evidence of indebtedness which has a fixed maturity date not more than 1 year from the date of issue." I.R.C. § 1283(a)(1)(A).

### B. The Tax Court Decision

The tax court held that Congress did not intend to require banks such as Security to accrue the stated interest on their loans made in the ordinary course of business. The court initially noted that §§ 1281 and 1283 are contained in Subpart V of Subchapter P of the Code, concerning special treatment of bonds and other debt instruments. According to the tax court, "the common thread of the sections included in Part V (i.e., sections 1271–1288) is that amounts defined as discount are to be taken into account as ordinary income in some appropriate manner." Tax Court Op. at 14. The court concluded it would have to read the statutory provisions in that context. When it turned to the text of the statute, the tax court noted that in defining the short-term obligations covered by the accrual rules, Congress spoke in terms of obligations that are issued, but did not mention loans. According to the tax court, when Congress intends to cover loans for tax purposes, it uses the terms "loan" and "made." Failure to use those terms in § 1283 convinced the tax court that § 1283 did not clearly extend to bank loans made in the ordinary course of business.

The tax court then turned to the legislative history. It determined that in enacting §§ 1281 through 1283, Congress intended to prevent certain taxpayers from taking advantage of the special rules for deferral of discount on purchased obligations, and that such a purpose did not apply to loans such as Security's, which are not purchased and carry no discount.

## II. DISCUSSION

■ In order to understand the issue presented here, some background is necessary. While § 1281(a) today requires the accrual of stated interest as well as discount, the original version enacted in 1984 required the accrual only of acquisition or original issue discount. Section 1281(a)(2), requiring the accrual of stated interest, was enacted as a

---

3. Acquisition discount is defined as the excess of the "stated redemption price at maturity (as defined in section 1273), over the taxpayer's basis for the obligation." I.R.C. § 1283(a)(2). Section 1273, in turn, defines "stated redemption price at maturity" as "the amount fixed by the last modification of the purchase agreement and includes interest and other amounts payable at that time (other than any interest based on a fixed rate, and payable unconditionally at fixed periodic intervals of 1 year or less during the entire term of the debt instrument)." I.R.C. § 1273(a)(2). In essence, a discounted obligation is one that the purchaser pays less than its redemption value to acquire. For example, an investor may purchase a bond for $800 dollars that will pay him $1000 upon maturity in two years.

technical correction in the Tax Reform Act of 1986, Pub.L. No. 99–514, § 1803(a)(8), 100 Stat. 2085, 2794 (1986). Both Security and the Commissioner agree that the addition of § 1281(a)(2) did not expand the kinds of obligations subject to the mandatory accrual rules. *See* Appellant's Br. at 21–22; Appellee's Br. at 7. Thus, the question for decision ultimately becomes whether as initially enacted in 1984, the obligations covered by § 1281 included bank loans made in the ordinary course of business.

## A. The Parties' Contentions

The parties provide vastly differing interpretations of the statutory language, and both contend that the language clearly supports their position.

Security claims that as initially drafted, § 1281 applied only to obligations purchased from third parties at a discount. Security points to the references to acquisition discount in §§ 1281(a)(1) and 1283(a)(2) and argues that § 1281 applies only to investors who purchase, i.e., "acquire" short-term obligations with acquisition discount and to taxpayers who purchase or "acquire" discounted short-term nongovernmental obligations involving original issue discount. In further support of this argument, Security points to the use in various other sections in Part V (e.g., §§ 1272, 1273, 1283) of terms such as purchase, agreement, price, and issue. Security also notes that the effective date of § 1281 has always been stated in terms of instruments "acquired" after a certain date, now December 31, 1985. Technical and Miscellaneous Revenue Act of 1988, Pub.L. No. 100–647, § 1018(c)(1), 102 Stat. 3578 (1988); *see also* Deficit Reduction Act of 1984, Pub.L. No. 98–369, § 44(d), 98 Stat. 560 ("obligations acquired after the date of enactment," July 18, 1984), and Tax Reform Act of 1986, Pub.L. No. 99–514, § 1803(a)(8)(A), 100 Stat. 2085, 2794 (1986) (amendments "[e]ffective with respect to obligations acquired after September 27, 1985").

Security also claims that the use of the term "issue" in the definition of "short-term obligation" in § 1283 demonstrates that bank loans are not covered by the mandatory accrual rules. According to Security, when Congress wishes to deal with the tax treatment of loans, it uses the terms "loan" and "made."

The Commissioner reads the language quite differently. It claims that § 1281 initially covered *all* short-term obligations, *see* § 1283(a)(1)(A), *held* by a bank, discounted or not. *See* § 1281(b)(1)(C). The obligations in question are short-term obligations (notes with a fixed maturity date not more than one year from the date of issue),[4] and Security is a bank. Therefore, the Commissioner reasons, Security must accrue the interest on these loans.

The Commissioner disputes Security's contention that the use of the term "acquisition discount" in § 1281(a) limits the scope of § 1281 to discounted obligations. First, the Commissioner notes that § 1281 is not limited to obligations "acquired" in a specific manner. The statute speaks of obligations *held* by a bank; it does not distinguish between obligations with regard to how the holder came to possess them, but only requires that the holder in fact possess them. *See* § 1281(b)(1)(C). Second, the Commissioner claims that nothing in § 1281(a) can limit the scope of the obligations covered by § 1281 because § 1281(a) does not purport to define the scope of § 1281. Section 1281(b) designates which obligations are subject to the accrual rules; § 1281(a) simply tells one what to do if the obligation is covered.

The Commissioner further contends that the reference to obligations being "issued" in § 1283(a)(1)(A) creates no ambiguity whatsoever. The Commissioner argues, with citations to common law and the Uniform Commercial Code, that "issue" merely refers to the delivery of the note or obligation to the holder by the obligor. In that sense, the Commissioner contends, Security's borrowers "issued" notes when they signed them in exchange for the loan proceeds.

Finally, the Commissioner plays down the legislative history that the tax court found dispositive. The Commissioner claims that

---

4. Security disputes that the loans in question are short-term obligations. As we determine the ac-

crual rules do not reach these obligations, we need not reach that question.

even though Congress might have expressed an intention to deal only with discounted loans initially, Congress drafted § 1281 using language that is broad enough to apply to undiscounted loans such as these.

## B. The Statutory Context

 The Commissioner's argument has considerable force, if one focuses solely on the language of §§ 1281 and 1283 and divorces them from the broader statutory context. But we cannot do that. The Supreme Court has noted that "the true meaning of a single section of a statute in a setting as complex as that of the revenue acts, however precise its language, cannot be ascertained if it be considered apart from related sections, or if the mind be isolated from the history of the income tax legislation of which it is an integral part." *Helvering v. Morgan's, Inc.,* 293 U.S. 121, 126, 55 S.Ct. 60, 62, 79 L.Ed. 232 (1934). According to the Court, the construing court's duty is " 'to find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested.' " *Commissioner v. Engle,* 464 U.S. 206, 216, 104 S.Ct. 597, 604, 78 L.Ed.2d 420 (1984) (quoting *NLRB v. Lion Oil Co.,* 352 U.S. 282, 297, 77 S.Ct. 330, 338, 1 L.Ed.2d 331 (1957) (Frankfurter, J., concurring in part and dissenting in part)). The circumstances of the enactment of particular legislation may be particularly relevant to this inquiry. *Watt v. Alaska,* 451 U.S. 259, 266, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981). Finally, when there is a reasonable doubt about the meaning of a revenue statute, the doubt is resolved in favor of those taxed. *Miller v. Standard Nut Margarine Co.,* 284 U.S. 498, 508, 52 S.Ct. 260, 262, 76 L.Ed. 422 (1932); *Burnet v. Niagara Falls Brewing Co.,* 282 U.S. 648, 654, 51 S.Ct. 262, 264, 75 L.Ed. 594 (1931); *Crooks v. Harrelson,* 282 U.S. 55, 51 S.Ct. 49, 75 L.Ed. 156 (1930); *Smietanka v. First Trust & Sav. Bank,* 257 U.S. 602, 606, 42 S.Ct. 223, 224, 66 L.Ed. 391 (1922).

### 1. Background to enactment

As in all cases of statutory interpretation, we must start with the text of the statute. But we cannot simply focus on §§ 1281 through 1283 because they do not exist in a vacuum. Rather, we must consider the context provided by the more general statutory scheme of which §§ 1281 and 1283 are a part. These sections are included within Part V of Subchapter P, Capital Gains and Losses. *See* I.R.C. §§ 1271–1288 (titled Special Treatment of Bonds and Other Debt Instruments). The common thread of these sections, the tax court noted, is that they all concern the inclusion of discount in income. *See, e.g.,* Subpart A, I.R.C. §§ 1271–1275 (titled Original Issue Discount); Subpart B, I.R.C. §§ 1276–1278 (titled Market Discount on Bonds); Subpart C, I.R.C. §§ 1281–1283 (titled Discount on Short–Term Obligations). Part V was added, in its entirety, as part of the Deficit Reduction Act of 1984, which makes it especially important to treat it as a whole. In order to further understand the statutory context of §§ 1281 through 1283, we must understand how Part V evolved.

Prior to the enactment of Part V, the holder of a debt instrument issued at a discount was required (subject to exceptions) to accrue and recognize as income the portion of the discount allocable to the portion of the year in which he held the discount obligation. *See* former I.R.C. § 1232A (1954 Code).[5] The code provided an exemption from that general rule for government obligations issued at a discount and payable without interest at a fixed maturity not exceeding one year. As to such short-term obligations, discount was not considered to accrue until the obligation was paid at maturity or otherwise disposed of. *See* I.R.C. § 454(b). Prior to 1984, Treasury Regulations similarly exempted nongovernment obligations issued at a discount and maturing in less than one year from the general rule requiring inclusion of such discount in income as it accrued. *See* Treas.Reg. § 1–1232–3A(b)(2) (1982).[6] Nothing in these rules provided for special treatment of loans containing only stated interest.

---

**5.** That requirement continues in Part V; *see* I.R.C. § 1272(a)(1) (1986 Code).

**6.** This exemption is continued in § 1272(a)(2)(C).

Part V was enacted to amend the treatment of such obligations. First, it made technical amendments to the original issue discount provisions. *See* I.R.C. §§ 1271–1275. Second, the amendments added provisions requiring market discount on government or corporate obligations to be treated the same as original issue discount. Thus, the new provisions required taxpayers to treat amounts received on disposition of the bonds as ordinary income (at least to the extent that it represented accrued market discount), and allowed taxpayers to elect to report the discount as income as it accrued. *See* I.R.C. §§ 1276–1278. Finally, the amendments altered the treatment of short-term discounted obligations. *See* I.R.C. §§ 1281–1283. Sections 1281 through 1283 initially required certain taxpayers holding short-term obligations (otherwise exempt from the accrual rules) to report as income the ratable portion of discount on short-term obligations as it accrued. In effect, § 1281 as initially enacted treated holders of short-term discount obligations subject to that section as if no exception from the accrual rules for short-term obligations ever existed.

Thus, the general statutory scheme into which §§ 1281 through 1283 fit shows a concern with the treatment of discounted obligations. We find no mention in this scheme of the treatment of bank loans made in the ordinary course of business. Given this context, we would expect that if Congress initially covered loans without discount, as the Commissioner contends, it would provide language clearly stating such an intention. We next examine the statutory text to see if it contains such a clear statement.

### 2. The statutory text

We conclude that the statutory text does not clearly cover obligations containing only stated interest. First, nothing in either the sections at issue or in the broader statutory scheme specifically refers to loans bearing only stated interest made in the ordinary course of a bank's business.

Second, we conclude that the actual text of the provisions is ambiguous with regard to whether such obligations are covered. On the one hand, as the Commissioner points

out, § 1281, as initially drafted, applied to "*any* short-term obligation . . . held by a bank." I.R.C. § 1281(b) (emphasis added). Under the Commissioner's reading, Security's obligations would be covered. The text of § 1281(a) as initially passed could also reasonably be read, however, to suggest that § 1281 initially covered only discounted short-term obligations. Section 1281(a) stated that for "*any* short-term obligation to which this section applies . . . there shall be included . . . the sum of the daily portions of *the* acquisition discount. . . ." I.R.C. § 1281(a) (emphasis added). The section did not provide for accrual of "any acquisition discount," or "acquisition discount, if any"; rather it provided for accrual of *the* acquisition discount. Moreover, *the* acquisition discount was to be accrued for "any short-term obligation to which this section applies." In the context of statutory changes actively affecting only discounted obligations, such unqualified language suggests that any obligation to which the section applies contains discount.

Additionally, the statutory phrases "acquisition discount" and "original issue discount" were defined in terms not normally applicable to bank loans made in the ordinary course of business. For example, § 1283 defines the term "acquisition discount" as "the excess of (A) the stated redemption price at maturity (as defined in section 1273), over (B) the taxpayer's basis for the obligation." I.R.C. § 1283(a)(2). Section 1273(a)(2), in turn, defines "stated redemption price at maturity" as "the amount fixed by the last modification of the purchase agreement." In common parlance, bank loans are not referred to as having a "price" or being memorialized in a "purchase agreement." The same is true of the term "original issue discount." Original issue discount is defined as the excess of an obligation's "stated redemption price at maturity" over its "issue price." Section 1273(b) defines "issue price" as the "initial offering price to the public" in the case of publicly offered debt instruments or the "price paid by the first buyer" for other debt instruments. Again, terms such as "issue price" and "buyer" are not generally associated with everyday bank

loans such as Security's. We believe that the use of such terms adds to the ambiguity as to whether § 1281 as initially drafted covered bank loans made in the ordinary course of business.

Finally, the definition of "short-term obligation" found in § 1283(a)(1)(A) is ambiguous. The definition of short-term obligations specifically refers to obligations maturing within one year "from the date of issue." It does not, however, specifically refer to loans. The Commissioner, as noted above, provides one plausible reading of the term "issue." The Commissioner provides no specific evidence to suggest that Congress used the term "issue" in that sense in § 1283, however. Again, Security provides an alternative, plausible reading. Throughout the tax code, when Congress wants to refer to lending transactions, it uses the terms "loan" and "made."[7] For example, § 581 defines commercial banks such as Security as entities "a substantial part of the business of which consists of receiving deposits and *making loans* . . . ." I.R.C. § 581 (emphasis added). Similarly, § 279(c) defines the lending or finance business as "a business of *making loans or purchasing or discounting accounts receivable, notes, or installment obligations.*" I.R.C. § 279(c)(5) (emphasis added). Given that Congress generally refers to loans when considering the tax treatment of loans, and that Congress specifically distinguishes between making loans and purchasing notes, Congress' failure to use terms such as "loan" and "made" in § 1283(a)(1)(A) at least creates ambiguity as to whether the definition of short-term obligations for purposes of the discount accrual rules includes loans such as these.

The Commissioner contends, however, that the structure of § 1281(a)(2) demonstrates that Congress initially intended to cover loans such as Security's. The Commissioner argues that § 1281(a)(2) operates independently of § 1281(a)(1), and thus whether an obligation is covered cannot depend upon whether it contains discount. According to the Commissioner, § 1281(a)(2) requires the accrual of any stated interest on "the obligation," and that "the obligation" can only refer to the first sentence of § 1281, which provides that accrual is required "[i]n the case of any short-term obligation to which this section applies . . . ." Thus, according to the Commissioner, § 1281(a)(2) bypasses § 1281(a)(1), and must operate on obligations *without* discount.

We are not convinced that the language is as clear as the Commissioner contends. First, as we have noted, § 1281, as initially enacted, can be read as limiting the scope of the "obligations to which [§ 1281] applies" to obligations containing discount. In that case, the referent for the term "the obligation" in § 1281(a)(2) is limited to discounted obligations. Second, the internal structure of § 1281(a)(2) suggests that it is limited to discounted obligations. The section excepts from its scope interest taken into account in determining the amount of *the* acquisition discount, not any acquisition discount. Use of the definite article "the" suggests to us that any obligation subject to § 1281(a)(2) would be an obligation containing discount.

We thus cannot conclude that when initially drafting § 1281, Congress used language that unambiguously included obligations not containing acquisition or original issue discount. Because of this ambiguity, we must consult the legislative history surrounding the passage of § 1281.

### 3. Legislative history

An examination of the legislative history of § 1281 convinces us that Congress intended to deal with discounted obligations, and not with undiscounted loans made in the ordinary course of business, when it enacted § 1281.

The first reference to what became § 1281(a) is found in a February 17, 1984,

---

7. A review of the code demonstrates that Congress has consistently employed the terms "loan" and "made" to describe lending transactions. *See* I.R.C. §§ 25(g), 42(i)(2)(C), 72(p)(2)(A), 108(f)(2)(D), 133(b)(2), 141(c)(1), 143(a)(2)(D), 144(b)(1), 147(b)(4)(B), 148(c)(2), 149(b)(2)(B), 267(f)(3)(C), 279(c), 312(i), 503(c), 542(d)(1), 593(d)(1)(D), 675(2), 856(c)(2)(G), 857(b)(6)(D)(v), 904(d)(5)(A), 954(c)(1)(E), 993(b)(8), 1250(a)(1)(B)(iv), 1272(a)(2)(E), 1382(g)(1)(B), 2503(g)(1), 4975(d)(1), 6047(e)(2), 6103(*l*)(3)(C)(i), 7507(a), 7701(a)(19)(C)(v), and 7872(b)(1).

hearing pamphlet prepared by the Staff of the Joint Committee on Taxation. Staff of Joint Committee on Taxation, Proposals Relating to Tax Shelters and Other Tax–Motivated Transactions (J.Comm.Print 1984). The hearing pamphlet proposed that interest incurred to purchase or carry short-term discount obligations should not be deductible until the interest paid on the obligations was included in the investor's income or, alternatively, the discount was accrued for purposes of reporting income. *Id.* at 93–94. The pamphlet described certain tax-motivated transactions in which investors could defer income on a discount obligation to a subsequent tax year while deducting interest incurred to purchase the obligation in a current tax year. *Id.*

Such concerns continued in the various reports prepared before and after the statute was adopted. For example, in describing the reasons for changing the law, the report of the House Ways and Means Committee stated: "The *special rules* that permit deferral of acquisition discount on ... short-term discount obligations are commonly used to defer tax liability on ordinary income," and "[t]he committee also is concerned that taxpayers have been making leveraged purchases of obligations eligible for the special rule at year-end to achieve tax deferral." H.R.Rep. No. 98–432, 98th Cong., 2d Sess. 1174, *reprinted in* 1984 U.S.C.C.A.N. pp. 697, 848 (emphasis added). The committee report described the bill as passed from committee as follows:

> The bill limits the scope of the *special rules* permitting deferral of acquisition discount and original issue discount on short-term obligations. Accrual basis taxpayers and those cash basis taxpayers who acquire Treasury bills and short-term original discount obligations in the course of a trade or business will be required to account for the acquisition or original issue discount on the accrual basis. Taxpayers will treat this change as a change of accounting method and space the payment of any net tax liability over 10 years. In addition the *bill limits the ability to use leveraged purchases of short-term obligations within the special rules to defer tax on ordinary income by deferring the deductions for interest on indebtedness used to purchase or carry short-term discounts obligations.*

Summary of Committee Amendment to H.R. 4170 (Tax Reform Act of 1984), as Adopted by the Committee on Ways and Means, 98th Cong., 2d Sess. 57 (Mar. 1, 1984) (emphasis added). This statement illustrates that the primary scope and purpose of the legislation was to apply the discount accrual rules to cash basis taxpayers that purchased short-term discount obligations pursuant to a leveraged purchase arrangement.

The final bill was enacted after conference on June 27, 1984. The report describing the bill demonstrates that the concerns raised in the Ways and Means Committee report were carried into the final bill as passed. In explaining § 1281, the Joint Committee on Taxation stated that § 1281 was intended to limit "the scope of the *special rules* permitting deferral of acquisition and original issue discount" and "the ability to use leveraged purchases of short-term discount obligations within the special rules to defer tax on ordinary income." Joint Committee on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, 98th Cong., 2d Sess. 101 (1984) (emphasis added).

Thus, the legislative history of § 1281 as initially enacted demonstrates that Congress was concerned with reducing abuses surrounding the special rules allowing deferral of discount. Nothing in the legislative history shows an intention to deal with problems surrounding obligations carrying only stated interest.

The Commissioner contends, however, that the legislative history surrounding the addition of § 1281(a)(2) demonstrates that it requires accrual of interest on short-term obligations that are not discounted. In describing the change, the House Committee stated:

> The bill clarifies that taxpayers subject to the rule for mandatory accrual are required to include in income for a taxable year all amounts of interest allocable to that year with respect to short-term obligations, irrespective of whether the interest is stated or is in the form of acquisition

discount or OID, and irrespective of when any stated interest is paid. For example, a calendar-year taxpayer designated in section 1281(b) holds an obligation from the time it is issued on October 1, 1985 until its maturity on October 1, 1986. Under the bill, the *taxpayer is required to include in income for 1985 the equivalent of three months interest on the obligation, regardless of whether the interest income is in the form of acquisition discount, OID, stated interest, or any combination thereof.*

H.R.Rep. No. 99–426, 99th Cong., 1st Sess. 886 (1985) (emphasis added). According to the Commissioner, Security, as a bank, is a taxpayer subject to accrual. It thus must, according to this legislative history, accrue interest on short-term obligations whether it is in the form of discount or stated interest.

We are not convinced. First, the passage itself states that it is limited to taxpayers "subject to the rule for mandatory accrual." We believe that prior to the enactment of § 1281(a)(2), the statute cannot be read to cover undiscounted bank loans made in the ordinary course of business. Thus, taxpayers holding notes generated from those loans are not subject to the rules for mandatory accrual. Second, there is clear legislative history providing that in enacting § 1281(a)(2), Congress did not intend to make a substantive change in the statute. In introducing the technical corrections measure, Rep. Rostenkowski, Chairman of the House Committee on Ways and Means, stated that:

The bill is intended to correct errors in these enacted bills in order to properly carry out the intent of Congress in enacting the earlier legislation ... [and] this bill intends simply to correct technical errors and to better reflect the Policies of Congress in enacting the original legislation.

131 Cong.Rec. H1630 (daily ed. Mar. 28, 1985) (statement of Rep. Rostenkowski) (emphasis added). Further, there are no "Reasons for Change" sections which are usually included in a tax statute's legislative history because "[a]ll amendments made by the title *are meant to carry out the intent of Congress in enacting the original legislation.*" H.R.Rep. No. 426, 99th Cong. 1st Sess. 877 (emphasis added); S.Rep. No. 313, 99th Cong., 2d Sess. 893. We must balance the statement concerning the scope of § 1281 after the addition of § 1281(a)(2) with the expressed intention of Congress not to make a substantive change in the law. We believe that the only way to balance these statements is to conclude that the addition of § 1281(a)(2) merely required taxpayers already subject to the mandatory accrual rules (those who purchased discounted short-term obligations) to accrue any stated interest on those obligations.

An examination of the legislative history thus demonstrates that loans such as Security's do not create the problem § 1281 was enacted to fix. The parties have not cited, nor have we found, any provision in the Internal Revenue Code (except for § 1281) requiring cash basis taxpayers such as Security to accrue the stated interest they receive on obligations they hold. Because there is no general rule requiring accrual of stated interest (like there is for discounted obligations), there is simply no "special rule" allowing deferral of stated interest like the rule for discounted short-term obligations. Applying the accrual rules to Security's short-term loans would not "plug a gap" in the accrual rules, but would create a special accrual rule where none otherwise existed. We find no indication that Congress in 1984 intended to create such a special accrual rule.

The Commissioner responds that banks such as Security can receive the same tax deferral as those holding discounted obligations by making a short-term loan on borrowed funds and not collecting interest until the following tax year. This argument proves too much. As a cash basis taxpayer, Security could receive the same tax deferral by making a short-term loan which matures in longer than one year.[8] Congress has ac-

---

8. The parties' fight over whether certain of Security's loans (those which mature on the first anniversary date) mature "not more than one year from the date of issue" proves this point.

There would be no fight unless Security is required to accrue interest only on its short-term loans. But, as noted above, if Security does not have to accrue stated interest on loans maturing

quiesced in such deferral by allowing banks such as Security to report their income on the cash basis. But if that is the case, requiring Security to accrue the stated interest on their short-term loans makes little sense. Security would be penalized simply for choosing to document its loans with notes maturing in less than one year, which all agree is good business practice. We cannot believe this is what Congress intended.

We also note that at the same time Congress passed § 1281(a)(2), it also passed § 448, which allowed banks such as Security to continue to report their income on the cash basis. *See* Tax Reform Act of 1986, Pub.L. No. 99–514, Title VIII, § 801(a), 100 Stat. 2085, 2345 (1986). We find it difficult to believe that Congress would take back with § 1281(a)(2) such a large amount of what it gave in § 448.

Finally, we note that members of Congress have introduced bills attempting to exempt small banks from the scope of the accrual rules. Such subsequent legislative history is entitled to little weight, if any. *Cf. South Carolina v. Regan,* 465 U.S. 367, 378 n. 17, 104 S.Ct. 1107, 1114 n. 17, 79 L.Ed.2d 372 (1984) (statutory interpretation cannot be informed by "the committee reports that accompany subsequent legislation"). We do not know why Congress failed to enact these bills. Maybe Congress agreed with the proposition, stated in those bills, that banks such as Security were covered. On the other hand, Congress might have believed that such loans never were covered, so such a bill would be superfluous. There are many reasons why such a bill might not be passed. That is why we do not rely on such legislative history. *See, e.g., United States v. Price,* 361 U.S. 304, 310–12, 80 S.Ct. 326, 330–31, 4 L.Ed.2d 334 (1960).

### III. CONCLUSION

An examination of the statutory context, the text of the relevant provisions, and the legislative history convinces us that the construction that is "most harmonious with its scheme and with the general purposes that

Congress manifested," *see Commissioner v. Engle, supra,* is one which excludes short-term loans such as Security's from the scope of the accrual rules. Moreover, because the application of § 1281 to these loans is ambiguous, we follow the venerable rule that "[i]n the interpretation of statutes levying taxes ... [courts must not] enlarge their operations so as to embrace matters not specifically pointed out. In case of doubt they are construed most strongly against the Government, and in favor of the citizen." *Gould v. Gould,* 245 U.S. 151, 153, 38 S.Ct. 53, 53, 62 L.Ed. 211 (1917). We thus hold that the mandatory accrual rules of § 1281(a)(2) do not apply to bank loans made in the ordinary course of business.

BEAM, Circuit Judge, dissenting.

I respectfully dissent. "If the [statutory] intent of Congress is clear, that is the end of the matter." *Chevron USA, Inc. v. NRDC,* 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). I agree with the Commissioner that IRC § 1281 unambiguously requires Security to report accrued interest income on the loans at issue in this litigation. Accordingly, I would reverse the tax court and reinstate the $48,437.80 deficiency assessment in Security's 1986 income tax.

---

in more than one year, it is achieving no undeserved tax windfall by making loans that mature

in less than one year.