No. 95-1894

_____

Citicasters, doing business as       *
WDAF-TV, formerly known as           *
Great American Television            *
and Radio Company, Inc.,             *
                                     *
          Appellee,                  *   Appeal from the United States
                                     *   District Court for the
     v.                              *   Western District of Missouri.
                                     *
Claire C. McCaskill, in her          *
capacity as Jackson County           *
Prosecutor,                          *
                                     *
          Appellant,                 *
                                     *
Board of Police Commissioners        *
of Kansas City, Missouri;            *
Steven Bishop, in his capacity       *
as Chief of Police of the            *
Kansas City, Missouri Police         *
Department; Ronald Parker, in        *
his capacity as a Kansas City,       *
Missouri police officer; Bailus      *
M. Tate, in his official             *
capacity as a member of the          *
Board of Police Commissioners        *
of Kansas City, MO; John A.          *
Dillingham, in his official          *
capacity as a member of the          *
Board of Police Commissioners        *
of Kansas City, MO; Jack W.R.        *
Headley, in his official             *
capacity as a member of the          *
Board of Police Commissioners        *
of Kansas City, MO; Dona R.          *
Boley, in her official capacity      *
as a member of the Board of          *
Police Commissioners of Kansas       *
City, MO; Emanuel Cleaver, II,       *
in his official capacity as a        *
member of the Board of Police        *
Commissioners of Kansas City,        *
MO,                                  *
                                     *
          Defendants.                *

_____

Submitted:  December 13, 1995

Filed:  July 19, 1996
_____

Before MAGILL, BRIGHT, and MURPHY, Circuit Judges.
_____

MAGILL, Circuit Judge.

Under the authority of a search warrant, investigating authorities seized a videotape from WDAF-TV (WDAF), Kansas City, Missouri, which recorded the commission of a crime.  The station owner, Citicasters, Inc., brought this lawsuit for damages and injunctive relief for an alleged violation of the Privacy Protection Act of 1980, 42 U.S.C. §§ 2000aa to 2000aa-12 (1994), against county prosecutor Claire C. McCaskill and Kansas City police officials.  The district court concluded that McCaskill had violated the Act, but dismissed the actions against the police.  It awarded $1000 in liquidated damages and ordered the return of the videotape.  See Citicasters v. McCaskill, 883 F. Supp. 1282 (W.D. Mo. 1995).

McCaskill appeals, asserting that the district court erred in barring her from showing that the circumstances relating to the seizure constituted exceptions to the requirements of the Privacy Protection Act, that the evidence did not support the judgment against her, and that injunctive relief is not available under the Act.  We agree with McCaskill that she was improperly barred from invoking the exceptions to the Act, and that there was insufficient evidence to support the judgment against her.  We reverse and remand.

**I.**

On August 5, 1994, at approximately 1:10 p.m., Julia Flege was assaulted in public and brutally murdered. Earl Warren, a tourist in Kansas City, captured the assault on videotape and, within hours, sold the videotape to plaintiff Citicasters, Inc., which operated WDAF, a local television station. WDAF presented a small portion of the tape on its 6 p.m. news broadcast later that same day.

Meanwhile, at approximately 1:30 p.m. on Friday, August 5, 1994, Chancey E. Wright was detained in connection with Flege's murder. Under Missouri law, Mo. Ann. Stat. § 544.170 (Vernon 1994), Wright had to be charged with the crime by 9:30 a.m. on Saturday, August 6, 1994, or be released. Learning of the videotape by its broadcast on the 6 p.m. news, Captain Vince McInerney, commander of the media relations office of the Kansas City Police Department, immediately contacted WDAF to request a copy of the videotape. WDAF refused to cooperate. Michael Lewis, the station's assignment manager, told McInerney that tourist Warren had left town with the original tape,[1] and that, while the

_____

[1]This conversation occurred at approximately 6:10 p.m. on August 5, 1994, the day of the assault. Warren, however, had not yet left town; he was, in fact, still on WDAF property. See J.A. at 113 (testimony of Michael Lewis). After discontinuing his conversation with Captain McInerney, station manager Lewis went to speak with tourist Warren and his wife. Although the manager was aware that the police desired a copy of the videotape of the assault, that the station had refused to allow the police to reproduce their copy, and that Warren had the original tape but was about to leave town, Lewis failed to apprise Warren that the police would like a copy of the tape. When Lewis again contacted the police several minutes later, at 6:14 p.m. on Friday, August 5, 1994, to provide them with Warren's home phone number and address in Texas and inform them that Warren would be home three days later, Lewis failed to mention that Warren was still in town, and still on station property. See id. at 111 (recorded phone message from Lewis). Warren left WDAF's parking lot at approximately 6:25 p.m. on August 5, 1994.

police could view the portion of the tape that the station had aired on the newscast, they could only obtain a copy of the entire tape through a court order.

The Kansas City police sought a search warrant for WDAF to obtain the videotape on the evening of August 5, 1994. In support of the application, affiant Ronald Parker, a police veteran of twenty-two years and a detective in the police department's homicide unit, submitted an affidavit which recited the circumstances of victim Flege's murder, including the killer's subsequent flight and assault on a police officer, and the existence of the videotape.[2] At 9:20 p.m. on the evening of August 5, 1994, approximately eight hours after the assault and abduction of Flege, the Honorable Richard E. Standridge, Associate Circuit Judge for Jackson County, Sixteenth Judicial Circuit, State of Missouri, issued a search warrant to the police. The warrant described the area to be searched--"The offices of the Great American Television and Radio Station, also known as WDAF Channel

---

[2]The search warrant application verified the following facts:

On [Friday,] 8/5/94 at approximately 1310 hours, Julia A. Flege, W/F, 7/14/62, was abducted from the Liberty Memorial Mall, 101 Memorial Drive. She was subsequently taken to the Santa Fe Apts.[,] 2525 Main, where she was killed by her abductor. As the suspect attempted to escape 2525 Main, Kansas City, Missouri Police Officer ordered the suspect to halt and drop his gun. The subject turned towards the officer and pointed the handgun at the officer. The officer fired one shot at the subject, missing him. The news broadcast at 1800 hours on Channel 4, [four hours and fifty minutes after Flege's abduction,] revealed a video tape shot by a private citizen which showed the abduction of the victim as well as the discharge by the Kansas City[,] Missouri police officer. Upon contacting official of Channel 4 [approximately five hours after Flege's abduction] and requesting a copy of the tape, detectives were advised that the tape could be reviewed but no copies would be released without a Court Order.

J.A. at 231.

-4-

4, at 3030 Summit, Kansas City, Jackson County, Missouri"--and the items to be seized--"The original video cassette tape, and copies of the video cassette tape, which show the abduction of Julia A. Flege which occurred at 101 Memorial Drive on 8/5/94 at approximately 1310 hours and the subsequent shooting which involved a Kansas City, Missouri Police Officer, occurring at 2525 Main"--and that there was probable cause to believe that the tape was at WDAF. J.A. at 232.

Police officers, accompanied by prosecuting attorneys, served the warrant at WDAF that evening at approximately 10 p.m., some nine hours and fifty minutes after the assault and abduction of Flege. An employee of WDAF met them at the station and called Michael McDonald, the vice president of news for WDAF. McDonald immediately came to the station. The officers showed vice president McDonald the search warrant and demanded the tape. McDonald responded that he would give them a copy of the material that had been aired on the newscast, but that he would only surrender the entire tape with a subpoena. Vice president McDonald called an attorney for WDAF who arrived at the station at approximately 11:15 p.m. on Friday evening. After further discussion and over WDAF's objections, the police finally obtained possession of WDAF's copy of the entire tape sometime between 11:45 p.m. and midnight that night. WDAF retained at least one copy of the portion of the tape that had been shown on the newscast.

Citicasters brought this suit against defendants, alleging a violation of the Privacy Protection Act because the police obtained the videotape through a search warrant, rather than a subpoena duces tecum. The district court held an expedited hearing on August 11-12, 1994. The district court entered a judgment against

McCaskill for $1000 liquidated damages under the Privacy Protection Act,[3] and McCaskill appeals.

## II.

The Privacy Protection Act generally prohibits government officials from searching for and seizing documentary materials possessed by a person in connection with a purpose to disseminate information to the public.  <u>See</u> 42 U.S.C. § 2000aa(b).  Instead, the Act requires law enforcement agencies to rely on the cooperation of the media or subpoenas duces tecum to obtain such documentary materials.  The Act contains important exceptions, however, where searches and seizures are permitted.  The Act provides that it:

> shall not impair or affect the ability of any government officer or employee, pursuant to otherwise applicable law, to search for or seize such materials, if--
>
> > (1) there is probable cause to believe that the person possessing such materials has committed or is committing the criminal offense to which the materials relate . . .
> >
> > (2) <u>there is reason to believe that the immediate seizure of such materials is necessary to prevent the death of, or serious bodily injury to, a human being</u>;
> >
> > (3) <u>there is reason to believe that the giving of notice pursuant to a subpena duces tecum would result in the destruction, alteration, or concealment of such materials</u>; or
> >
> > (4) such materials have not been produced in response to a court order directing compliance with a subpena duces tecum, and--

---

[3]The district court also determined that the police were immune from suit under the Act and dismissed the claim against them.  The district court dismissed a related claim for violations of civil rights under 42 U.S.C. § 1983 against all the defendants. These dismissals are not before us.

-6-

> (A) all appellate remedies have been exhausted; or
>
> (B) there is reason to believe that the delay in an investigation or trial occasioned by further proceedings relating to the subpena would threaten the interests of justice.

42 U.S.C. § 2000aa(b) (emphasis added).

As an affirmative defense, McCaskill asserted that the exceptions at 42 U.S.C. §§ 2000aa(b)(2) and (3) applied, barring Citicasters from recovering under the Act. Noting that Detective Parker's affidavit in support of the search warrant did not expressly recite exceptions (2) and (3), the district court refused to allow McCaskill to prove the existence of these exceptions in this case. The district court stated:

> [T]he question for the court to consider is whether the defendant may claim an exception to the Act when the application for the search warrant is devoid of reasons supporting the exception. The court finds that to allow a defendant to claim an exception, after a search and seizure has occurred, allows a defendant to justify its conduct in hindsight. The legislative history of the Act envisioned that a defendant would state the basis for exceptions when applying for the warrant. Moreover, if circumstances exist which constitute an exception, the defendant should state these reasons in an affidavit for a warrant. Thus, because the affidavit in support of the search warrant did not set forth reasons which fall under an exception to the Act, the court will not allow defendants to now invoke those exceptions.

Citicasters, 883 F. Supp. at 1288.[4]

---

[4]The only legislative history cited by the district court to support its conclusion is a reference by the Senate Committee on the Judiciary, during its discussion of one of the exceptions to the Act, to factors which "might be considered by a magistrate." 1980 U.S.C.C.A.N. 3950, 3959. See Citicasters, 883 F. Supp. at 1288.

-7-

We review the district court's interpretation of the Privacy Protection Act de novo. See United States v. Lowe, 50 F.3d 604, 606 (8th Cir.), cert. denied, 116 S. Ct. 260 (1995). There is no mention in the Privacy Protection Act of any requirement that search warrant applications describe exceptions to the Act,[5] and we must determine if it was proper for the district court to rely on the legislative history of the Act to create such a requirement.

It is a fundamental canon of statutory interpretation that

we begin with the language of the statute and ask whether Congress has spoken on the subject before us. If the intent of Congress is clear, that is the end of the matter; for the court . . . must give effect to the unambiguously expressed intent of Congress.

Norfolk & Western Ry. v. American Train Dispatchers' Ass'n, 499 U.S. 117, 128 (1991) (quotations omitted); see also Negonsott v. Samuels, 507 U.S. 99, 104 (1993) ("Our task is to give effect to the will of Congress, and where its will has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive.") (quotations omitted); Barnhill v. Johnson, 503 U.S. 393, 401 (1992) ("appeals to statutory history are well-taken

---

[5]This appears to be an issue of first impression. We note that the United States Attorney General, pursuant to the Privacy Protection Act's mandate, see 42 U.S.C. § 2000aa-11, has promulgated guidelines defining the procedures by which federal agents may seek search warrants to obtain documentary materials in the hands of disinterested third parties. See 28 C.F.R. §§ 59.1-59.6 (1995). At § 59.1(b), the regulations declare that "[i]t is the responsibility of federal officers and employees to recognize the importance of these personal privacy interests, and to protect against unnecessary intrusions." Factors which a government officer should consider in deciding whether to seek a search warrant or a subpoena include "[w]hether the immediate seizure of the materials is necessary to prevent injury to persons or property . . . ." § 59.4(c)(2)(ii). Nowhere do the regulations advise federal agents to document these concerns in the application for a search warrant; rather, these are determinations to be made by the federal agents, their supervisors, and agency attorneys. See § 59.4(a)(2).

only to resolve statutory ambiguity") (quotations omitted); <u>Virginia Univ. Hosp., Inc. v. Casey</u>, 499 U.S. 83, 98-99 (1991) ("The best evidence of [statutory] purpose is the statutory text adopted by both Houses of Congress and submitted to the President. Where that [statutory text] contains a phrase that is unambiguous--that has a clearly accepted meaning in both legislative and judicial practice--we do not permit it to be expanded or contracted by the statements of individual legislators or committees during the course of the enactment process."); <u>Arkansas AFL-CIO v. FCC</u>, 11 F.3d 1430, 1440 (8th Cir. 1993) (en banc) ("If the intent of Congress is clear from the plain language of the statutory provision, that will be the end of the judicial inquiry."). This rule of statutory interpretation exists because "when, as here, the statutes are straightforward and clear, legislative history and policy arguments are at best interesting, at worst distracting and misleading, and in neither case authoritative." <u>Northern States Power Co. v. United States</u>, 73 F.3d 764, 766 (8th Cir. 1996).

We find no ambiguity in the Privacy Protection Act. <u>See</u> <u>Brown v. Gardner</u>, 115 S. Ct. 552, 555 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context."). The Act presents a straightforward statutory scheme for protecting those engaged in information dissemination from government intrusion by prohibiting searches and seizures of documentary materials except where government officials have a reasonable belief that a statutory exception applies. Although Congress could have chosen to include elaborate procedural requirements in the Act,[6] it instead created a private cause of action as the exclusive

---

[6]The dissent argues that "it is the absence of procedural requirements rather than any ambiguity that is crucial in deciding this case." Slip op. at 15. We disagree. It is precisely the lack of ambiguity that is crucial in this case, for this mandates that we enforce the plain language of the statute. That Congress did not choose to substantially interfere with the procedures by which state judicial officers issue search warrants to state law enforcement officials more likely reflects, in our view, congressional appreciation of the proper restraints of federalism, rather than congressional ineptitude in drafting the legislation that it intends.

remedy to ensure that the protections of the Act would be effective, and allowed recovery of damages against those found liable for violations of the Act.  See 42 U.S.C. §§ 2000aa-6(a), (d), (f).[7]

Where Congress has provided a specific means for achieving its purpose, we must honor its decision, and not embellish its legislative scheme with additional procedural innovations.  See, e.g., Director, Office of Workers' Comp. Prog. v. Newport News Shipbuilding & Dry Dock Co., 115 S. Ct. 1278, 1288 (1995) ("Every statute proposes, not only to achieve certain ends, but also to achieve them by particular means--and there is often a considerable legislative battle over what those means ought to be."); MCI Telecommunications Corp. v. American Tel. & Tel. Co., 114 S. Ct. 2223, 2232 n.4 (1994) (Courts and agencies "are bound, not only by

---

Indeed, we note that Congress did choose to somewhat modify the search warrant application process in other circumstances.  See 42 U.S.C. § 2000aa(c) (where 42 U.S.C. § 2000aa(b)(4)(B) exception applies, person possessing materials may submit an affidavit contesting issuance of warrant).  We find that this strongly suggests that Congress is capable of enacting the legislation that it intends, and that by its silence Congress did not mean to create additional procedural requirements.  The district court, however, interpreted this provision somewhat differently.  While noting that "[a] literal reading of the statute reveals that an affidavit can only be submitted when a search warrant is obtained after non-compliance with a subpoena duces tecum," Citicasters, 883 F. Supp. at 1290, the district court nevertheless required the availability of an affidavit whenever "a government entity bypasses the primary protection provided by a subpoena."  Id.  While we may not reach this point on appeal because it was not raised by the parties, we do observe that the "literal reading" of a statute is often the best place to begin, and end, an interpretive analysis.

[7]The dissent, arguing that "the majority pulls the teeth out of the statute" by failing to add procedural requirements, Slip op. at 20, simply ignores this legislative determination that the award of damages is sufficient to ensure an effective statute.

-10-

the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes."). Had Congress desired to create additional procedural requirements to guard against post hoc justifications for searches, it presumably would have done so; it is not for the federal courts to redraft legislation merely because we would have selected different procedures.[8]

Because there is no ambiguity in the statute, the district court erred in relying on the legislative history of the Privacy Protection Act. Because the Privacy Protection Act does not require an application for a search warrant to describe any exceptions to the Act, the district court erred in imposing such requirements on the defendants in this case. McCaskill should have had the opportunity to prove that the exceptions claimed in fact existed, and we remand for a hearing on this issue.

## III.

The district court found that "Claire McCaskill, the Prosecuting Attorney of Jackson County, Missouri, assisted in executing the search warrant on plaintiff at its business premises." Citicasters, 883 F. Supp. at 1285. This Court reviews a district court's factual findings for clear error. See Stevens v. McHan, 3 F.3d 1204, 1206 (8th Cir. 1993). "A factual finding is

---

[8]Although, by its terms, the Privacy Protection Act significantly restricts the ability of law enforcement officials to search for and to seize certain documentary evidence of crimes, Congress took pains to limit the Act's chilling effect on law enforcement. See, e.g., 42 U.S.C. § 2000aa-6(e) (materials shall not be excluded as evidence because of a violation of the Act); 42 U.S.C. § 2000aa-6(b) (creating good faith defense to civil action). With due respect, the district court's expansive interpretation of the Act simply disregards the balance struck by Congress between preserving the ability of government officials to prosecute crime and protecting those engaged in the dissemination of information from government intrusion.

clearly erroneous if it is not supported by substantial evidence in the record, if it is based on an erroneous view of the law, or if the reviewing court is left with the definite and firm conviction that an error has been made." Burns v. McGregor Elec. Indus., Inc., 955 F.2d 559, 563 (8th Cir. 1992). McCaskill asserts that there is insufficient evidence to support the district court's finding that she or anyone acting on her behalf participated in the execution of the search warrant.

McCaskill's position is well taken. At the initial hearing, an assistant county prosecutor testified that "the prosecutor's office is not directly involved with the searching, or the serving [of] a search warrant." J.A. at 91. Indeed, under Missouri law, a search warrant "may be executed only by a peace officer." Mo. Ann. Stat. § 542.276.7 (Vernon 1994).

We are aware of only two instances in the record which would indicate that McCaskill engaged in the search and seizure. First, in her answer to the complaint, McCaskill, who was one of a host of defendants in this action, admitted that "defendants came to plaintiff's business premises and served plaintiff with a search warrant." J.A. at 129, 140. Second, at the preliminary hearing, McCaskill examined an assistant prosecuting attorney from her office. One question she asked the attorney began, "At the point in time that we took the tape . . . ?" J.A. at 79. A question from an attorney is hardly strong evidence of a proposition, however, and the testimony at trial indicated that McCaskill herself was not present when the warrant was initially served. See J.A. at 54.

Nevertheless, if McCaskill's statements are not sufficient evidence of her participation in the search and seizure, they were at least misleading to the plaintiffs. The hearing held in the district court was not a full hearing, and Citicasters should have the opportunity to establish that McCaskill directed, supervised,

or otherwise engaged in the execution of the warrant to such an extent that a finding can be made that she "searched for or seized" the tape.  See 42 U.S.C. § 2000aa(b).  Accordingly, we remand and "exercise our discretion to order a new trial rather than a judgment for defendant." F & H Inv. Co. v. Sackman-Gilliland Corp., 728 F.2d 1050, 1055 (8th Cir. 1984) (citing 9 Wright & Miller, Federal Practice & Procedure: Civil § 2540 & p. 617 (1971)).

## IV.

The district court required that the actual tape seized be returned to the plaintiff:

> With regards to plaintiff's request for return of its videotape, the court notes that at the hearing held on August 12, 1994, defendants agreed to return to plaintiff the videotape seized on August 5.  The court was under the impression that the tape was returned to plaintiff.  Indeed, defendants contend that the original tape has been returned to plaintiff.  Plaintiff, however, claims that its request for injunctive relief for return of the videotape is not mooted because defendants have provided plaintiff with a copy of the videotape in question.  Plaintiff maintains that defendants still retain the original videotape.  It was this court's understanding that the original videotape was returned to the plaintiff.  Thus, the defendants shall return the original videotape to the plaintiff if they have not already done so.

Citicasters, 883 F. Supp. at 1289.

The district court labeled this order as a form of injunctive relief, and the parties have briefed the issue in that context.  We conclude, however, that the district court was not actually granting an injunction, but was rather reaffirming the prior agreement of the parties.  It is unclear from the record whether the parties disputed Citicaster's right to regain the actual tape seized.  If there is any continuing dispute concerning the return

of the seized tape, we leave its resolution to the district court on remand.

## V.

We reverse the district court and remand for an evidentiary hearing on the issue of McCaskill's participation in the search and seizure. If the district court finds that McCaskill did participate in the search and seizure, the court shall also determine whether, at the time of the search, McCaskill possessed a reasonable belief that an exception to the Privacy Protection Act existed.

BRIGHT, Circuit Judge, concurring in part and dissenting in part.

Under most circumstances, the Privacy Protection Act prohibits the government, in connection with the investigation of a criminal offense, from searching and seizing documentary materials from news or information organizations. See 42 U.S.C. § 2000aa(b). Under the Act, the government may not obtain a search warrant but must instead rely upon a subpoena duces tecum or the voluntary release of the materials. The Act, however, exempts certain situations where immediate seizure is justified, such as where a risk exists that the materials may be destroyed or another person may be physically harmed. The case before us raises the question whether government officials may claim such exceptions to the Privacy Protection Act when the application for the search warrant is devoid of any statements supporting those exceptions. Because I conclude that the Privacy Protection Act constrains government action by requiring the government to establish an exception to the Act before it can obtain a warrant to search the office of a news agency, I dissent from Part II of the opinion.

I agree with the majority that "[t]he task of resolving the dispute over the meaning of [a statute] begins where all such

-14-

inquiries must begin:  with the language of the statute itself." United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989).  The Privacy Protection Act specifically lists the four exceptions to the Act and requires "reason to believe" that one of the invoked exceptions applies. Contrary to the position of the majority, however, the statute contains no direct statement as to whether it is the issuing magistrate judge who must determine the existence of an exception or whether its existence can be asserted after-the-fact by the investigating authorities.[1]  The Act establishes a substantive standard but is silent as to the appropriate procedural requirements.

Although the majority opinion explains that the language of the statute is not ambiguous, it is the absence of procedural requirements rather than any ambiguity that is crucial in deciding this case.  The areas the statute addresses are clear and we need not and should not embellish upon them.  The statute, however, does not address the process for obtaining a warrant.  It is this absence of a statutory directive which faces us here.

Where the statute does not speak on an issue, this court has turned to other sources to determine the intent of Congress.  The legislative history may provide guidance.  See Wisconsin Public Intervenor v. Mortier, 501 U.S. 597, 611-12 n. 4 (1991); Arkansas AFL-CIO v. F.C.C., 11 F.3d 1430, 1440 (8th Cir. 1993) (en banc)

---

[1]The text of the statute implies that the issuing magistrate judge must find the existence of an exception before a lawful warrant can issue.  One of the exceptions pertains to instances where the party in possession has failed to comply with a subpoena duces tecum and further delay would "threaten the interests of justice."  42 U.S.C. § 2000aa(b)(4).  In such an event, section 2000aa(c) requires that the person in possession be afforded the opportunity to submit an affidavit stating why the materials sought are not subject to seizure before the warrant issues.  This exception, without directly stating so, presupposes that a magistrate judge, rather than the investigating authorities, makes the determination.

(conducting a <u>Chevron</u> analysis).  The circumstances surrounding the enactment of the statute can also be helpful in deciphering congressional intent.  <u>See</u> <u>Security Bank Minnesota v. C.I.R.</u>, 994 F.2d 432, 436 (8th Cir. 1993).  When interpreting a statute, we must consider the statute in light of judicial concepts existing before it was enacted.  <u>Estate of Wood v. C.I.R.</u>, 909 F.2d 1155, 1160 (8th Cir. 1990); <u>Stillians v. Iowa</u>, 843 F.2d 276, 280 (8th Cir. 1988).  Finally, we look to the overall purpose of the Act.  <u>See</u> <u>In re Graven</u>, 936 F.2d 378, 385 (8th Cir. 1991).

The Privacy Protection Act was prompted by the Supreme Court's decision in <u>Zurcher v. Stanford Daily</u>, 436 U.S. 547 (1978).  <u>See</u> S. Rep. No. 874, 96th Cong., 2d Sess., <u>reprinted in</u> 1980 U.S.C.C.A.N. 3950, 3950-51.  In <u>Zurcher</u>, the Stanford Daily, a student newspaper, had published articles and photographs of a demonstration at which several police officers were assaulted.  456 U.S. at 550-51.  As part of its investigation, the district attorney obtained a search warrant and searched the newspaper's offices for additional photographs of the incident.  <u>Id</u>. The newspaper brought a declaratory judgment action claiming, among other things, that the search warrant was issued in violation of the Fourth Amendment.  The district court held, "unless the Magistrate has before him a sworn affidavit establishing proper cause to believe that the materials in question will be destroyed, or that a subpoena duces tecum is otherwise `impractical', a search of a third party for materials in his possession is unreasonable per se, and therefore violative of the Fourth Amendment." <u>Stanford Daily v. Zurcher</u>, 353 F. Supp. 124, 127 (N.D. Cal. 1972).[2]  The

---

[2]In explaining its decision, the district court stated,

It should be apparent that means less drastic than a search warrant do exist for obtaining materials in possession of a third party.  A subpoena duces tecum, obviously, is much less intrusive than a search warrant: the police do not go rummaging through one's home, office, or desk if armed only with a subpoena.  And, perhaps equally important, there is no opportunity to challenge the search warrant prior to the intrusion, whereas one can always move to quash the subpoena before producing the sought-after materials.

<u>Stanford Daily v. Zurcher</u>, 353 F. Supp. 124, 130 (N.D. Cal. 1972).

court of appeals affirmed per curiam, adopting the opinion of the district court.  550 F.2d 464 (9th Cir. 1977).  The Supreme Court reversed, holding that the Fourth Amendment does not provide any special protection against search and seizure for the possessor of documentary evidence who is not a suspect in the offense under investigation.  436 U.S. at 560.

At the close of the majority opinion in Zurcher, the Court stated, "[o]f course, the Fourth Amendment does not prevent or advise against legislative or executive efforts to establish nonconstitutional protections against possible abuses of the search warrant procedure, . . ."  Id. at 567.  Congress took the "invitation" of the Court and enacted the Privacy Protection Act of 1980.  See 1980 U.S.C.C.A.N. at 3952.

Congress stated that the Privacy Protection Act responded to the Zurcher decision.  Id. at 3950.  In Zurcher, the Supreme Court addressed whether the application for a search warrant must establish "special circumstances" before a warrant to search the office of a news agency may lawfully issue.  Zurcher focused entirely on the substantive issue of what circumstances must be established; there was no dispute as to when or by whom the determination would be made.  Both Justice White's majority opinion and the dissenting opinion of Justice Stevens indicated that it was the issuing magistrate judge who would determine whether the necessary requirements were fulfilled.  See 436 U.S. at 550, 577.  Thus the legislative reaction to Zurcher focused on the substantive standard rather than the undisputed procedural framework.  The

logical conclusion is that Congress envisioned the procedural framework to remain intact.

The legislative history of the Act indicates that Congress assumed that the exceptions to the Act would be considered by a magistrate judge _prior_ to the issuance of a search warrant.  In discussing the third exception to the Act, the Senate Report provides:

> Among the factors which the Committee believes might be considered by a magistrate in determining whether materials might be destroyed are evidence of a close personal, family or business relationship between the person in possession of the material with a person who is a suspect; evidence of prior, similar conduct by a party who may exert control of the material; or evidence that a party in possession of the material has expressed an intent to hide, move, or destroy the material sought.

1980 U.S.C.C.A.N. at 3959-60 (emphasis added).  Senators Orrin Hatch and Alan Simpson of the Senate Judiciary Committee submitted "additional views" which were included in the legislative history.  The Senators stated:

> The _Stanford Daily_ case held that the Constitution does not require a magistrate to conclude that warrant searches of the press are necessarily "unreasonable".  The committee in adopting [the Act] is, in effect, instructing magistrates and others empowered to issue warrants that a search directed at the documentary materials of journalists is to be considered in itself "unreasonable" in the absence of certain enumerated circumstances.

1980 U.S.C.C.A.N at 3968.

The legislative history of the Act also indicates that although the Privacy Protection Act is a statutory rather than a constitutional limitation on the power of the government, it was

intended to be read in conjunction with the Fourth Amendment.[3]  First, Zurcher was a Fourth Amendment case.  Second, the "legal history" of the Privacy Protection Act as developed in the Senate Report is comprised entirely of the historical development of the Fourth Amendment.  See 1980 U.S.C.C.A.N. at 3952-54.  Finally, in defining the purpose of the Act, the Senate Report stated,  "The Committee bill, as amended, affords the press and certain other persons not suspected of committing a crime with protections not provided currently by the Fourth Amendment."  1980 U.S.C.C.A.N. at 3950.  The legislative intent was to build upon the Fourth Amendment.

In United States v. United States District Court, 407 U.S. 297, 316 (1972), the Supreme Court relayed "the very heart of the Fourth Amendment directive:

> where practical, a governmental search and seizure should represent both the efforts of the officer to gather evidence of wrongful acts and the judgment of the magistrate that the collected evidence is sufficient to justify invasion of a citizen's private premises or conversation.  Inherent in the concept of a warrant is its issuance by a "neutral and detached magistrate."

Id. (citation omitted).[4]  In the warrant process, it is the

---

[3]The language of the statute implies that the Act was intended to be a statutory extension of the Fourth Amendment.  Section 2000aa-6(e) provides that the statute does not extend the application of the exclusionary rule:  "Evidence otherwise admissible in a proceeding shall not be excluded on the basis of a violation of this chapter."  Nothing on the face of the Act specifically invokes the exclusionary rule.  Unless the Act were intended as a statutory extension of the Fourth Amendment, disclaiming the exclusionary rule would be an anomaly.  The presence of this provision thus indicates that the statute extends the framework of the Fourth Amendment, but is not intended to extend the exclusionary rule.

[4]Justice Jackson underscored the importance of a neutral magistrate judge in effectuating the goals of the Fourth Amendment:

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies

province of the magistrate judge to independently find the existence of the requisite conditions before a lawful warrant can issue. When viewed in conjunction with this constitutional allocation of responsibility, the Privacy Protection Act logically places the determination of whether an exception exists in the discretion of the magistrate judge issuing the search warrant.

By construing the Act so as not to require a prior judicial determination, the majority pulls the teeth out of the statute. The purpose of the Privacy Protection Act is to prevent the search and seizure of documentary materials from persons disseminating information. After-the-fact review can only punish violation, not prevent it. Furthermore, permitting an after-the-fact showing of what was "known" to the affiant but not communicated to the magistrate judge contains too great a potential for abuse; there could often be no assurance that the critical facts and details were in fact known prior to the issuance of the warrant. See 2 Wayne R. LaFave, Search and Seizure § 4.3(a), at 459 (3d ed. 1996).

In its decision, the majority ignores the circumstances surrounding the enactment of the Privacy Protection Act, its legislative history, its intimate association with Fourth Amendment principles, and its purpose of preventing searches and seizures. For these reasons, I must dissent as to Part II of the court's opinion.

---

law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enter-prise of ferreting out crime.

Johnson v. United States, 333 U.S. 10, 13-14 (1948).

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.