# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-24-00535-CR

---

**The State of Texas, Appellant**

**v.**

**Jason Nassour, Appellee**

---

### FROM THE 299TH DISTRICT COURT OF TRAVIS COUNTY
### D-1-DC-24-904061, THE HONORABLE KAREN SAGE, JUDGE PRESIDING

---

### NO. 03-24-00536-CR

---

**The State of Texas, Appellant**

**v.**

**Robert Chody, Appellee**

---

### FROM THE 299TH DISTRICT COURT OF TRAVIS COUNTY
### D-1-DC-24-904060, THE HONORABLE KAREN SAGE, JUDGE PRESIDING

---

### O P I N I O N

The State has indicted appellees Jason Nassour and Robert Chody for tampering with evidence and conspiracy to tamper with evidence.[1]  *See* Tex. Penal Code §§ 15.02,

---

[1]  Nassour and Chody are codefendants, and the State's issues and arguments in each appeal are identical.  Therefore, we consider the appeals together for the sake of judicial economy.

37.09(a)(1). In the present appeal, the State challenges an interlocutory order entered by the trial court, which the State contends constructively quashed parts of its indictments. *See* Tex. Code Crim. Proc. art. 44.01(a)(1) (authorizing State to appeal from order dismissing indictment, information, or complaint, or any portion thereof). We will reverse the trial court's order and remand for further proceedings consistent with this opinion.

## BACKGROUND[2]

On January 18, 2018, Williamson County and the Williamson County Sheriff's Office (WCSO) entered into an access agreement with Big Fish Entertainment (Big Fish), a New York-based production company that produced the television show Live PD using contracted independent camera crews. The agreement had been actively pursued by Chody, the elected Williamson County Sheriff from 2017 through 2020, and was negotiated by both Nassour, a former Assistant Williamson County Attorney, and Hal Hawes, general counsel for the Williamson County Commissioners Court.

Live PD broadcast to viewers the activities of WCSO deputies as they interacted with the public and carried out their official duties. Despite its name, the show was not actually live. Audiovisual recordings for Live PD fell into one of two categories: "pre-recorded segments" filmed in advance, which WCSO had twenty-four hours to review and comment on, and recordings made at the time of broadcast, which were subject to a delay during which a WCSO representative present in the control room could review the footage. Although the

---

[2] These are interlocutory appeals, and certain portions of the records have been ordered sealed by the trial court. The parties are familiar with the facts of the case; accordingly, we provide only a general overview of the facts here, drawn from the testimony presented at trial and the parties' joint stipulations of fact and pleadings. We provide additional facts in the opinion as necessary to advise the parties of the Court's decision and the basic reasons for it. *See* Tex. R. App. P. 47.1.

recordings were owned by Big Fish, WCSO had the ability to modify or limit both categories of recordings before they were aired. The agreement, which was signed by Chody, also included a "destruction provision," which provided that unaired, or "raw," footage "shall be destroyed by [Big Fish] no later than thirty (30) days[3] after the Raw Footage is captured, except to the extent [Big Fish is] required to retain the Raw Footage pursuant to a valid court order or other state or federal laws." Although the agreement expired on July 16, 2018, Big Fish and WCSO continued to work together as before.[4]

On March 27, 2019, a Live PD crew consisting of producer Ruby Tarzian and cameramen James Moriarty and Colin Mika accompanied WCSO deputies on patrol and recorded footage for potential use on a future pre-recorded segment. Mika rode with Deputy James "JJ" Johnson, and Tarzian and Moriarty rode with Deputy Zachary Camden. The deputies were equipped with microphones, and outward-facing GoPro cameras were mounted to the windshield of each patrol vehicle. Mika and Moriarty each carried a handheld camera. Neither deputy wore a body camera.

Around 1:23 a.m. on March 28th, Deputy Johnson attempted to stop an approaching driver for failing to dim his high beams. The driver refused to stop. Deputy Johnson started pursuit, which Deputy Camden quickly joined and which ended in Travis County at approximately 1:45 a.m. after the driver, later identified as Javier Ambler, Jr., crashed his vehicle. A physical struggle occurred when the deputies attempted to restrain Ambler, who

[3] Prior to being approved by the Commissioners Court, the agreement was modified by Hawes, who reduced the ninety-day period negotiated by Nassour to thirty days and added the phrase "or other state or federal laws."

[4] On April 24, 2019, Chody signed a second access agreement, which was backdated to January 16, 2019. The new agreement was placed on the Commissioners Court agenda but was withdrawn before a vote was held. On May 21, 2019, commissioners voted 3-2 not to terminate the original access agreement.

became unresponsive during the altercation. Moriarty and Mika recorded the incident on their handheld cameras, and Moriarty then placed his camera and gear in Deputy Camden's patrol vehicle. Mika retained possession of his camera.

WCSO deputies taped off the crash area as a crime scene. Deputy Camden's patrol vehicle was inside the crime scene, from which the Live PD crew was excluded. Crewmembers asked to retrieve Moriarty's handheld camera but were told that they could not. Around 3 a.m., Chody arrived at the scene and responded, "Good call" when told that the crew had been prohibited from retrieving the camera. Nassour arrived shortly after and spoke with Chody, who instructed a deputy to have officers with body cameras turn them off. Around 3:10 a.m., a deputy escorted Moriarty to Deputy Camden's patrol vehicle, and Moriarty retrieved his handheld camera and gear. The Live PD crew then left the scene with Kate Mika, another producer for the show and Colin's wife.

Later on the morning of March 28th, WCSO and the Austin Police Department held a meeting at which WCSO was tasked with obtaining Live PD's camera footage. Around noon, Kate mailed the SD cards containing the recordings via FedEx to Big Fish's New York headquarters.

On April 3rd, then Travis County Assistant District Attorney Mark Pryor obtained a grand jury subpoena *duces tecum* addressed to A&E, the network on which Live PD was broadcast. A&E acknowledged receiving the subpoena on May 22nd. On June 5th, Chody texted Kara Kurcz, a Big Fish employee, and informed her that an "IA investigation was done shortly after the incident," and Kurcz texted another Big Fish employee, "[N]o wrong[]doing suspected [from] the actual autopsy review[,] and Grand Jury stuff since there was a death can

4

take months.  But IA is closed and cops back to working."  The following day, June 6th, Chody texted Kurcz, "April 12th IA concluded.  Criminal case still outstanding."

On June 7th, Pryor emailed a Big Fish attorney, Cameron Stracher, about the Live PD recordings, and Stracher responded:  "Footage is typically recycled within days of being filmed, and I just wanted to confirm if that had been the case here as well.  I have now confirmed that neither Big Fish nor A&E has any footage from this event."

The State indicted Nassour and Chody for tampering with evidence and conspiracy to tamper, alleging that they had acted to conceal or destroy the audiovisual recordings of deputies' interaction with Ambler by permitting the Live PD crew to leave the scene with the recordings.  Chody filed a pretrial application for writ of habeas corpus and motions to quash[5] the indictment in his case on the basis that the State's prosecution was preempted by the federal Privacy Protection Act of 1980 (PPA).[6]  *See* 42 U.S.C. §§ 2000aa–2000aa-12.

---

[5]  Although Nassour filed a request to join Chody's motions to quash, it does not appear that the trial court ruled on the request.

[6]  Subject to various exceptions and limitations, the PPA makes it illegal for

> a government officer or employee, in connection with the investigation or prosecution of a criminal offense, to search for or seize any work product materials possessed by a person reasonably believed to have a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication [or . . .] documentary materials, other than work product materials, possessed by a person in connection with a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication.

42 U.S.C. § 2000aa(a)–(b).

The trial court declined to rule on the motions to quash, and Chody filed a motion in limine, in which he asked the court in relevant part to prohibit the State from alluding to; discussing; arguing; or introducing evidence, directly or indirectly, that Nassour and Chody "had any legal right or ability" to seize the audiovisual recordings or to refuse to allow the Live PD crew to retrieve their personal belongings or leave the scene with the recordings.

The trial court held a hearing on the motion in limine and granted it in part, ordering that the State instruct its witnesses that they "cannot answer any question in a manner that would violate [] any of the paragraphs granted by this Order." However, the court later signed an amended order requiring the State to approach the bench and seek a definitive ruling before "taking any action contrary to the scope" of the motion in limine.

The State appealed from the trial court's order in limine, and we rejected its argument that the order effectively suppressed evidence or dismissed the indictments. *State v. Nassour*, No. 03-23-00079-CR, 2023 WL 4495209, at *3 (Tex. App.—Austin July 13, 2023, pet. ref'd) (mem. op., not designated for publication); *State v. Chody*, No. 03-23-00080-CR, 2023 WL 3512601, at *5 (Tex. App.—Austin May 18, 2023, pet. ref'd) (mem. op., not designated for publication). We explained that the order instead "directed the State to approach the bench to seek a definitive ruling before presenting evidence or discussing the topics covered by the motion in limine and informed the State that it may ask the trial court to reconsider its ruling." *Nassour*, 2023 WL 4495209, at *3; *Chody*, 2023 WL 3512601, at *4. Because we concluded that the order was an order in limine, we dismissed the State's appeals for want of jurisdiction. *Nassour*, 2023 WL 4495209, at *3; *Chody*, 2023 WL 3512601, at *5.

The State subsequently filed a motion for the trial court to rule on Nassour's and Chody's eight pending motions to quash the indictments, a motion for an evidentiary hearing for

6

the court to rule on the admissibility of evidence under the PPA, and a motion for a pretrial hearing to determine the admissibility of evidence under the order in limine. The trial court did not rule on the State's motions.

The State reindicted both cases in June 2024. Following the reindictments, Nassour filed three motions in limine, concerning, respectively, Chody's "good call" statement, "evidence of rumors and speculation," and "any evidence alleged in the State's notice of 'bad acts.'" The court granted the motions in limine concerning the "good call" remark and evidence of rumors but also stated that it was "going to just refuse to make rulings on these motions in limine right now with the understanding that the State runs the risk of having lots of defense objections interrupt the[] case at trial."

Questions about the trial court's order in limine and its implications on the preemptive effect of the PPA continued at trial. The issue arose during a pretrial hearing concerning whether the State should be allowed to read the full indictments and what evidence the State would be allowed to preview during its opening statement. Chody's primary trial counsel, Gerry Morris, asked the trial court to limit the State's opening to exclude anticipated evidence that might fall under the order in limine, and the State requested that the court rule on the request before the jury was sworn and jeopardy attached. The court stated that it would first swear the jury and "then we can discuss all the other issues."

After the jury was sworn, the trial court informed the parties that it would allow the State to read the full indictments and that the State should bear in mind during its opening the court's order in limine that "until there's some evidence to suggest that that release from the – from the squad car is not protected by the PPA, we're not going to get into that."

7

On the second day of trial, the trial court held a hearing outside the jury's presence to determine whether testimony that the State intended to elicit from Roy Fikac, the former WCSO assistant chief of law enforcement, would violate the court's order in limine. Following Fikac's testimony, the trial court ruled that, "who gave the order to give [the recordings] back is not relevant because somebody had to give the order to give them back." The State asked in clarification whether it was correct that the trial court had "ordered that going forward with witnesses, [the State] cannot get into who gave the order to return the video to Live PD because under the Court's ruling, that is not relevant," to which the court agreed.

The following day, the State announced that as a result of the trial court's oral ruling, the State had filed a notice of appeal and motion for stay of proceedings. The trial court recessed the proceeding, excused the jury, and granted the State's motion for a stay. In its brief, the State contended that the trial court's ruling was not just an evidentiary ruling but effectively quashed portions of the indictments by prohibiting the State from introducing evidence to prove its allegations. The State also contended that the trial court had erred by determining that the PPA preempted the prosecution.

Nassour and Chody filed emergency motions to dismiss the State's appeals, arguing that this Court lacked jurisdiction because the record did not contain a written appealable order and because the trial court had not dismissed the indictments. Concluding that the trial court's oral ruling "effectively terminated the State's prosecution and that the State has the right to appeal the ruling," we abated the appeals and remanded the causes to the trial court for "entry of a signed and written order memorializing its oral ruling, including any effect of the PPA on the State's prosecution" of Nassour and Chody. *State v. Nassour*, 706 S.W.3d 627, 633 (Tex. App.—Austin 2024, pet. dism'd); *State v. Chody*, 706 S.W.3d 619, 626 (Tex. App.—Austin

8

2024, pet. dism'd).  In light of the abatements, we dismissed Nassour and Chody's motions as moot.

Following remand, the trial court signed an order in which it found and ordered in relevant part that the "video footage at issue in this matter fell within the protections of the Privacy Protection Act" and could not be "legally seized" by Nassour and Chody "without a subpoena or court order" and that "the mere return of the video footage is not relevant unless the State introduces other facts that would show that the footage was returned to the crew for a reason other than compliance with federal law."[7]

## DISCUSSION

In two issues, the State contends that the trial court's order effectively dismissed parts of the State's indictments, making the order appealable under article 44.01(a)(1), and that the trial court abused its discretion by excluding evidence based on a determination that the PPA "limit[s] the evidence admissible at trial."  Chody responds that "the trial court's opinion regarding the impact of the PPA on the admissibility of evidence was well founded and [its] rulings at trial could never properly be deemed to have been outside the zone of reasonable disagreement and hence an abuse of discretion."  He also argues that the court "has not invalidated this prosecution due to the PPA" but has only ruled that "evidence that creates a

---

[7] While the appeals were abated, Nassour and Chody again filed motions to dismiss arguing that we lack jurisdiction and that the order that we had asked the trial court to memorialize did not exist.

9

potential inference that Chody may have authorized the release of the audio and video tapes from the location is not relevant and hence not admissible due to the PPA."[8]

## I. Can the State appeal the trial court's written order under article 44.01(a)(1)?

We first address whether this Court has jurisdiction over these appeals. Significantly, we note that the trial court continues to frame its order as a non-final, contingent ruling in limine.

A ruling in limine is a "preliminary ruling only," *Geuder v. State*, 115 S.W.3d 11, 14–15 (Tex. Crim. App. 2003), and "merely requires the parties to approach the trial court for a definitive ruling before attempting to put on evidence within the scope of the motion in limine order," *Thierry v. State*, 288 S.W.3d 80, 86 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). A trial court does not make a ruling in limine when it makes a definitive, final ruling on the permissible scope of questioning or the admissibility of evidence. *See Draughon v. State*, 831 S.W.2d 331, 333 (Tex. Crim. App. 1992).

In its order on remand, the trial court found that "[t]he video footage at issue in this matter fell within the protections of the [PPA]" and "could not be legally seized by either defendant at the scene, without a subpoena or court order." Thus, the court reasoned, "the mere return of the video footage is not relevant unless the State introduces other facts that would show that the footage was returned to the crew for a reason other than compliance with federal law." The court's order goes beyond the purely administrative act of requiring the parties to approach the bench to discuss an evidentiary matter. *See Harnett v. State*, 38 S.W.3d 650, 655 (Tex. App.—Austin 2000, pet. ref'd) (order in limine is not "one on the merits" that excludes evidence

---

[8] Nassour waived briefing and stated that he "stands on his previous pleadings in this case and in the previous appeal," adding that he "welcomes this Court's resolution of the jurisdictional issue."

but regards only "the administration of the trial"). By concluding that the audiovisual recordings were covered by the PPA and that evidence of their return was therefore irrelevant under the State's proffered theory of its case, the trial court made a final, definitive ruling on the admissibility of evidence beyond the scope and purpose of a motion in limine. *See Draughon*, 831 S.W.2d at 333.

The Court of Criminal Appeals has expressly distinguished "an order that the parties approach the bench before going into the matter" of a motion in limine from a "flat[] refus[al]" that a party be allowed to ask a specific question. *See Nunfio v. State*, 808 S.W.2d 482, 484 (Tex. Crim. App. 1991), *overruled on other grounds by Gonzales v. State*, 994 S.W.2d 170 (Tex. Crim. App. 1999). Here, the trial court explicitly made such refusals on the basis of its order, ruling that "to the extent [the State was] asking any of the officers who gave the order to give it back[, it] is not relevant"; that "going forward with witnesses," the State "cannot get into who gave the order to return the video to Live PD because under the Court's ruling, that is not relevant"; and that the State could not "get into where Jeff Moriarty left his camera and the fact that [the Live PD crew] asked for it back and were told no."

Having concluded that the trial court's written order on remand is not an order in limine, the question before us is whether the order dismissed the State's indictments or any portion of the indictments and was therefore appealable by the State. *See* Tex. Code Crim. Proc. art. 44.01(a)(1); Tex. R. App. P. 25.2.

Article 44.01(a)(1) of the Code of Criminal Procedure vests Texas prosecutors with "broad powers" and must be liberally construed. *State v. Chupik*, 343 S.W.3d 144, 146 (Tex. Crim. App. 2011); *State v. Moreno*, 807 S.W.2d 327, 333 (Tex. Crim. App. 1991) (quoting Tex. Gov't Code § 312.006). Under the article, the State has the power to appeal whenever an

11

order "effectively terminates the prosecution in favor of the defendant," which occurs when an order's effect "forces any alteration of the indictment or information," and the State "is not willing to comply with that order." *Moreno*, 807 S.W.2d at 332, 334. In other words, the question is whether the trial court has effectively foreclosed the State from proceeding with the charging instrument of its choice and thus prevented the State from pursuing its theory of prosecution. *Id.* at 333 n.7. We treat the fact that the State has appealed as "sufficient indication . . . that the State is unwilling to alter the indictment or information and that for all practical purposes, the prosecution in the trial court has 'terminated.'" *Id.* at 334.

That the State might be able to amend its charging instrument in response to the trial court's order is "of no significance." *Id.* at 333. "[T]he State is entitled to stand on its charging instrument and appeal a trial court's adverse ruling dismissing the same, even if amendment is possible." *State v. Plambeck*, 182 S.W.3d 365, 370 (Tex. Crim. App. 2005); *see Ex parte Perry*, 483 S.W.3d 884, 916 (Tex. Crim. App. 2016) ("[A] trial court has no authority to order the State to amend an indictment; the State has the right to stand on its indictment and appeal any dismissal that might result from refusing to amend.").

Article 44.01(a)(1) has no temporal limitation. *State v. Stanley*, 201 S.W.3d 754, 758 (Tex. Crim. App. 2006). The State may appeal an order that has the effect of dismissing all or part of a prosecution even after jeopardy has attached. *Id.* at 757. As long as the trial court does not ultimately address the issue of guilt or innocence, "there is no double jeopardy impediment to the State's appeal." *Id.* at 759.

Although the trial court has styled its order as an order in limine, and Nassour and Chody characterize it as an "evidentiary ruling," the Court of Criminal Appeals has instructed that we must look to the order's effect, not its label or the particular proceeding that led to

12

the order, when determining our jurisdiction under article 44.01(a)(1). *See State v. Garcia*, 638 S.W.3d 679, 681 (Tex. Crim. App. 2022); *Smith v. State*, 559 S.W.3d 527, 533 (Tex. Crim. App. 2018). The article "has been construed to mean the State may appeal any order, short of an acquittal, which has the effect of terminating the prosecution, regardless of how the order is labeled or characterized." *State v. Rosseau*, 398 S.W.3d 769, 774 (Tex. App.—San Antonio 2011), *aff'd*, 396 S.W.3d 550 (Tex. Crim. App. 2013). As the Court has acknowledged, "if we were to allow trial courts the unfettered discretion to protect their erroneous or questionable rulings merely by calling them something other than dismissals, this would vitiate any power of the State to appeal." *Moreno*, 807 S.W.2d at 333. Instead, in addressing the State's right to appeal, courts focus on two "major themes": 1) does the ruling effectively prevent the government from presenting its case to a jury, and 2) is the ruling based upon an erroneous interpretation or application of law? *State v. Medrano*, 67 S.W.3d 892, 899 (Tex. Crim. App. 2002).

Count one of the indictment alleged that Nassour and Chody intentionally or knowingly concealed or destroyed the audiovisual recordings with the intent to impair their availability as evidence in the investigation of Ambler's death. Overt act five of count two alleged that they "allowed and authorized" the recordings "to be taken away from the crime scene and the location where the investigation or official proceeding was initiated, thus subjecting the [recordings] to the mandatory destruction provision." And overt act eight alleged that they "allowed or authorized one or more representatives of Live PD and Big Fish Entertainment, to include Jeffrey Moriarty, to enter a secure crime scene and remove items, including camera equipment and recordings and footage, from the secure crime scene." By ordering that the PPA applied to the audiovisual recordings; that Nassour and Chody could not

13

legally seize them without a subpoena or court order; and that, consequently, evidence of the recordings' return was inadmissible on the basis of relevance, the trial court effectively dismissed parts of the indictments by preventing the State from pursuing its chosen theory of prosecution and the charging instruments on which it wished to proceed. As the State repeatedly urged, it could not prove count one or overt acts five and eight without evidence that Nassour and Chody played some part in the recordings' being removed from the scene.

The trial court appeared to believe that so long as part of the State's indictments survived, the court was not impairing the prosecution, stating, "I'm a little confused how this one fact completely eviscerates your case. I mean, there are a lot of other allegations and if – it's just not clear to me." Yet, as discussed above, the State can appeal orders that dismiss only a portion of an indictment. *See* Tex. Code Crim. Proc. art. 44.01(a)(1). By effectively terminating count one and overt acts five and eight, the trial court foreclosed the State from proceeding on its chosen indictments and theory of prosecution. *Moreno*, 807 S.W.2d at 333–34 & n.7. For these reasons, we conclude that the State had the right to appeal from the trial court's ruling as memorialized in its written and signed order on remand. We sustain the State's first issue and, having done so, next consider the merits of the trial court's order. Nassour's and Chody's motions to dismiss are denied.

## II.    Is the trial court's order based on an erroneous application of the preemption doctrine?

Having concluded that we have jurisdiction over these appeals, we must next determine whether the trial court's order was "based upon an erroneous interpretation or application of law." *Medrano*, 67 S.W.3d at 899.

14

The trial court has ruled that the "video footage at issue in this matter fell within the protections of the Privacy Protection Act" and could not be "legally seized" by Nassour and Chody "without a subpoena or court order" and that "the mere return of the video footage is not relevant unless the State introduces other facts that would show that the footage was returned to the crew for a reason other than compliance with federal law." It has done so in response to Nassour's and Chody's repeated argument that the PPA preempts enforcement of Texas's tampering and conspiracy laws against them. In effect, the trial court has held a substantial portion[9] of the prosecution preempted under the PPA—making the State's evidence irrelevant.

### A.      Preemption Law and Standard of Review

"Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona v. United States*, 567 U.S. 387, 398 (2012). "From the existence of two sovereigns follows the possibility that laws can be in conflict or at cross-purposes." *Id*. at 398–99. "The Supremacy Clause provides a clear rule that federal law 'shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'" *Id.* at 399 (quoting U.S. Const. art. VI, cl. 2). The Supreme Court of the United States has recognized three kinds of preemption: 1) *express*,[10]

---

[9] As noted, the order's conflicting claim that the trial court "has not ordered and does not believe that the PPA preempts these prosecutions" is likely explained by the court's apparent belief, addressed below, that preemption requires that no part of the indictment survive. The court's understanding is exemplified in its statement to the prosecution, "The PPA doesn't preempt your prosecution at all. And there are many elements of your indictment that have nothing to do with the PPA."

[10] *See, e.g.*, *Gobeille v. Liberty Mut. Ins.*, 577 U.S. 312, 319 (2016) ("The text of ERISA's express pre-emption clause is the necessary starting point. It is terse but

where the federal law explicitly states that it preempts state law; 2) *field*,[11] where the federal regulation is so comprehensive that it leaves no room for state laws; and 3) *conflict*,[12] where it is impossible to comply with both laws simultaneously, or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *Kansas v. Garcia*, 589 U.S. 191, 202, 208, 211 (2020). But all three "work in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018).

There are two cornerstones of preemption jurisprudence. First, "the purpose of Congress is the ultimate touchstone in every pre-emption case." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (internal quotation marks omitted). "Second, in all pre-emption cases, and particularly in those in which Congress has legislated in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* (internal quotation marks and alterations omitted).

---

comprehensive. ERISA pre-empts 'any and all State laws insofar as they may now or hereafter relate to any employee benefit plan.'").

[11] *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 401 (2012) ("The framework enacted by Congress leads to the conclusion here, as it did in *Hines*, that the Federal Government has occupied the field of alien registration.").

[12] *See, e.g.*, *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 366 (2000) ("[T]he Burma law of the Commonwealth of Massachusetts, restricting the authority of its agencies to purchase goods or services from companies doing business with Burma, is invalid under the Supremacy Clause of the National Constitution owing to its threat of frustrating federal statutory objectives.").

"Preemption is a question of law reviewed de novo." *Texas Mut. Ins. Co. v. PHI Air Med., LLC*, 610 S.W.3d 839, 846 (Tex. 2020).

## B.      Application

The PPA prohibits police searches or seizures of work product and documentary material intended for publication—including raw audio and video footage.   Subsection (b) provides:

> (b) Notwithstanding any other law, it shall be unlawful for a government officer or employee, in connection with the investigation or prosecution of a criminal offense, to search for or seize documentary materials,[13] other than work product materials, possessed by a person in connection with a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication, in or affecting interstate or foreign commerce; but this provision shall not impair or affect the ability of any government officer or employee, pursuant to otherwise applicable law, to search for or seize such materials, if—
>
>> (1) there is probable cause to believe that the person possessing such materials has committed or is committing the criminal offense to which the materials relate . . . ;
>>
>> (2) there is reason to believe that the immediate seizure of such materials is necessary to prevent the death of, or serious bodily injury to, a human being;
>>
>> (3) there is reason to believe that the giving of notice pursuant to a subpoena duces tecum would result in the destruction, alteration, or concealment of such materials; or
>>
>> (4) such materials have not been produced in response to a court order directing compliance with a subpoena duces tecum, and—
>>
>>> (A) all appellate remedies have been exhausted; or

---

[13]   *See* 42 U.S.C. § 2000aa-7(a) (defining "documentary materials" as "materials upon which information is recorded, and includes, but is not limited to, written or printed materials, photographs, motion picture films, negatives, video tapes, audio tapes, and other mechanically, magnetically, or electronically recorded cards, tapes, or discs, but does not include contraband or the fruits of a crime or things otherwise criminally possessed, or property designed or intended for use, or which is or has been used as, the means of committing a criminal offense").

> (B) there is reason to believe that the delay in an investigation or trial occasioned by further proceedings relating to the subpoena would threaten the interests of justice.

42 U.S.C. § 2000aa(b).

A similar provision prevents a search or seizure of work product materials, with only the first two exceptions available. *Id.* § 2000aa(a). Subsection (c) provides for objections to search warrants for documentary materials sought based on the fourth exception: "In the event a search warrant is sought pursuant to paragraph (4)(B) of subsection (b), the person possessing the materials shall be afforded adequate opportunity to submit an affidavit setting forth the basis for any contention that the materials sought are not subject to seizure." *Id.* § 2000aa(c).

The PPA does not explicitly state that it preempts state statutes, and Congress has not otherwise occupied the field of prosecutions of tampering or conspiracy.

The trial court's ruling could only be based on conflict preemption. Although the trial court made an explicit finding that it "has not ordered and does not believe that the PPA preempts these prosecutions," it has essentially held either that it is impossible for law enforcement officers to comply with the PPA without running afoul of Texas's tampering and conspiracy laws or that Texas's tampering and conspiracy laws, as applied to law enforcement officers alleged to have tampered with or conspired to tamper with documentary materials intended for publication, stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

To evaluate conflict preemption, we first examine the purpose of Congress in enacting the federal law. *Wyeth*, 555 U.S. at 565. We then evaluate whether it is impossible to

comply with both laws simultaneously or whether state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *Id.*

### 1. The purpose of Congress in enacting the PPA

The PPA "was passed in response to *Zurcher v. Stanford Daily*, 436 U.S. 547 (1978), in which the Supreme Court held that the Fourth Amendment did not prohibit police from undertaking searches and seizures of documentary evidence held by innocent third parties, such as the newspaper whose records were searched in the case." *Guest v. Leis*, 255 F.3d 325, 340 (6th Cir. 2001). "According to the Senate Report, the Privacy Protection Act was enacted to afford 'the press and certain other persons[14] not suspected of committing a crime with protections not provided currently by the Fourth Amendment.'" *Id.* (quoting S. Rep. No. 96–874, at 4 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 3950); *see Henriquez v. Georgia Dep't of Revenue*, No. 21-12567, 2023 WL 4624473, at *10 (11th Cir. July 19, 2023) (per curiam) ("The purpose behind the Privacy Protection Act, as set forth in the Senate Committee on the Judiciary's report, was to afford additional statutory protection to the First and Fourth Amendment rights of the press and related groups."). "The Act presents a straightforward statutory scheme for protecting those engaged in information dissemination from government intrusion by prohibiting searches and seizures of documentary materials except where government officials have a reasonable belief that a statutory exception applies." *Citicasters v. McCaskill*, 89 F.3d 1350, 1355 (8th Cir. 1996). The Act requires law enforcement officials to

---

[14] The Senate Report rejected the notion that the PPA was intended to be a "press only" bill and instead recognized that it was intended to apply to "all those who have a purpose to disseminate information to the public." S. Rep. No. 96–874, at 9 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 3950. Moreover, the law was intended to reach not only "materials which are to be disseminated to the public" but also "materials which are gathered in the course of preparing such a publication, yet are at some point determined to be unsuitable for publication." *Id.* at 10.

19

instead rely on voluntary cooperation or compliance with a subpoena duces tecum. *See* 42 U.S.C. § 2000aa(b)(4).

       2.       *Whether it is impossible to comply with both laws simultaneously, or whether state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress?*

In its indictments, the State alleges in relevant part that Chody and Nassour tampered or conspired to tamper with evidence by intentionally and knowingly *releasing* video evidence to the Live PD cameramen who shot the videos, knowing that they depicted an in-custody death and intending to impair their availability in a pending death investigation. *See* Tex. Penal Code §§ 15.02(a) (defining criminal conspiracy), 37.09(a)(1) (providing that person tampers with evidence if, knowing that investigation or official proceeding is pending or in progress, he "alters, destroys, or conceals any record, document, or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding"). Under the State's theory of the case, as repeatedly urged by the State to the trial court and demonstrated by the State's proffers, "The core conduct at issue here had to do with *releasing* the videos and recording equipment from that patrol vehicle that day . . . . [A]s the State made clear in many a pretrial hearing and many a pretrial filing, that is the core of the State's case." (emphasis added). The indictments also explicitly alleged that Nassour and Chody committed overt acts in pursuance of a conspiracy to tamper with the recordings, including by *permitting the recordings to be taken* from the crime scene and by *allowing the Live PD crew to enter the scene and remove* the recordings. This case, from the beginning, has never been about a search or seizure; it is about evidence already inside a patrol vehicle parked within a secure crime scene. A federal rule making it unlawful for a government officer or employee, in connection with the investigation or prosecution of a criminal offense, to search for or seize documentary materials

20

has no application in a case involving materials already in the possession of the government officer or employee. It is not impossible to comply with both laws simultaneously.

Nor does this state-law prosecution stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. Quite the opposite.

"Although Congress could have chosen to include elaborate procedural requirements in the [PPA], it instead created a private cause of action as the exclusive remedy to ensure that the protections of the Act would be effective, and allowed recovery of damages against those found liable for violations of the [PPA]." *Citicasters*, 89 F.3d at 1355 (citing 42 U.S.C. §§ 2000aa–6(a), (d), (f)). Congress never intended for the PPA to affect admission of evidence, rather, it expressly provided, "Evidence otherwise admissible in a proceeding shall not be excluded on the basis of a violation of this chapter." 42 U.S.C. § 2000aa-6(e). Nor did Congress intend to prevent a government officer or employee's access to documentary materials altogether: "this provision shall not impair or affect the ability of any government officer or employee, pursuant to otherwise applicable law, to search for or seize such materials," if "there is reason to believe that the giving of notice pursuant to a subpoena duces tecum would result in the destruction, alteration, or concealment of such materials," or if "such materials have not been produced in response to a court order directing compliance with a subpoena duces tecum," and "there is reason to believe that the delay in an investigation or trial occasioned by further proceedings relating to the subpoena would threaten the interests of justice." *Id.* § 2000aa(b)(2), (4).

"Where Congress has provided a specific means for achieving its purpose, we must honor its decision, and not embellish its legislative scheme with additional procedural innovations." *Citicasters*, 89 F.3d at 1355 (rejecting television station's argument that PPA

21

requires application for search warrant to describe any exceptions to act; noting that lack of specified warrant procedure indicated "congressional appreciation of the proper restraints of federalism").

And that is what we have here—the embellishment of a legislative scheme with an additional procedural innovation—the quashing of part of the tampering and conspiracy indictments targeting law enforcement officers—to achieve the purpose of the PPA. In its ruling, the trial court has found the historic police powers of the state to be superseded by the Act, although that was not the clear and manifest purpose of Congress. *See Wyeth*, 555 U.S. at 565. As noted by the State, the PPA neither 1) "expressly address[es] criminal prosecutions"; nor 2) contains language evincing "any intent regarding the enforcement of state criminal laws"; nor 3) "touches on the handling of evidence contained within—indeed voluntarily placed inside a patrol vehicle parked within—a secure crime scene." There is no textual support for an implied preemption of the enforcement of state criminal statutes involving criminal tampering or conspiracy to tamper even when the evidence allegedly tampered with is the type of documentary material protected by the PPA and even when the defendants are government officers or employees. "Implied preemption analysis does not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives; such an endeavor would undercut the principle that it is Congress rather than the courts that pre-empts state law." *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (internal quotation marks omitted).

A high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act. *Id.* That threshold is not met in this case. Here, Texas exercised its police powers to pass a criminal law that applies equally to officers and non-officers; just

because some applications of those laws implicate documentary materials intended for publication does not mean that the statute conflicts with federal law. *See Kansas*, 589 U.S. at 212 ("[I]n the vast majority of cases where federal and state laws overlap, allowing the States to prosecute is entirely consistent with federal interests.").

We hold, as a matter of law, that the PPA does not preempt the prosecution of Nassour or Chody for tampering or conspiracy. State criminal prosecutions of government officers in connection with tampering with evidence do not create an obstacle, for federal preemption purposes, to the objectives of protecting those engaged in information dissemination from government intrusion set forth by Congress in the PPA. We sustain the State's second issue, reverse the trial court's order, and remand these causes for further proceedings consistent with this opinion. *See* Tex. R. App. P. 43.2(d).

_____

Rosa Lopez Theofanis, Justice

Before Chief Justice Byrne, Justices Kelly and Theofanis
  Dissenting Opinion by Chief Justice Byrne

Reversed and Remanded

Filed:  June 13, 2025

Publish